UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 10 CR 673 |
| vs. | ) | |
| | ) | Hon. Matthew F. Kennelly |
| TOMMY MOORE | ) | |

## GOVERNMENT'S OBJECTIONS TO
## PRESENTENCE INVESTIGATION REPORT

The UNITED STATES OF AMERICA, by Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, respectfully submits its Objections to the Presentence Investigation Report ("PSR") of defendant Tommy Moore.

Although the PSR recognizes that there is sufficient evidence to prove that members of the New Breeds street gang possessed and used firearms, it incorrectly concludes that the two-level enhancement for possession of a dangerous weapon does not apply to Moore. For the reasons explained below and during the upcoming sentencing hearing, the government respectfully requests that the Court apply the Guideline § 2D1.1(b)(1) enhancement for possession of a dangerous weapon to Moore's offense level.

The PSR also incorrectly calculates Moore's criminal history points as five, resulting in criminal history category III. As explained below, because Moore was under a criminal justice sentence, namely, parole, while a member of the drug conspiracy, his criminal history points should equal seven, resulting in his placement in criminal history category IV.

## I.    Background

On February 3, 2012, Moore pleaded guilty to conspiracy to possess and distribute more than 1000 grams of heroin, in violation of 21 U.S.C. § 846. [Dkt. 530.] In his plea declaration, Moore acknowledged that he conspired with co-defendants Dana Bostic, Brandon Richards, Aaron Bagley,

and others known and unknown to knowingly and intentionally possess with intent to distribute and to distribute 1000 grams or more of mixtures and substances containing heroin. *Id.* at 1. Specifically, Moore admitted that he was a street supervisor in a drug-trafficking operation that centered around Pulaski, Van Buren, Congress, and Karlov on the west side of Chicago. *Id.* at 2. Moore admitted that he obtained multiple packs containing user quantities of heroin from Richards and Bagley, which Moore then distributed to street-level workers for further distribution to customers at the drug spots controlled by the Bostic Organization. *Id.* Moore received the proceeds from the street sales of heroin from the street-level workers, which Moore then returned to Richards, Bagley, or other members of the Bostic Organization. *Id.*

## II.    The Conspiracy

As detailed in the Affidavit in support of the criminal complaint in this case (the "Affidavit") [Dkt. #1], the Government's Version of the Offense (attached to the PSR), and the PSR, Moore was a mid-level member of the Bostic drug-trafficking organization (the "Bostic Organization"). Beginning no later than 2008 and on a daily basis, he obtained at least five packs containing user quantities of heroin at a time from Richards, Bagley, and other members of the Bostic Organization.[1] Moore then passed out the packs of heroin to street-level workers for further distribution in the Bostic Territory, which was the area bordered by Pulaski, Van Buren, Congress, and Karlov on Chicago's west side. The street-level workers sold the heroin to customers, returning the proceeds

---

[1]Cooperating defendants Bagley, Cornelius Thomas, and Maurice Davis have identified Moore as a member of the conspiracy as early as 2007. According to Bagley, he began selling packs for the Bostic Organization in November 2007 to March 2008. At that time, he was a runner for the Bostic Organization, along with Davis, Moore, Gill, and other unindicted coconspirators. According to Davis, he was a runner in 2007, along with Bagley, Gill, Moore, and other unindicted coconspirators.

to Moore, who passed along the proceeds to Bagley or Richards, minus the portion of the proceeds that he kept as his personal profit.

 Moore knew that coconspirators Maurice Davis, Raynard Bowser, Derek Thomas, Parish Mitchell, Raymond McClain, and Tommy Adams were all street sellers for the Bostic Organization, and Moore saw each of the selling heroin or passing out heroin for others to sell for the Bostic Organization beginning no later than 2008.

Moore was also aware of the extent of the membership in and drug trafficking of the Bostic Organization as the result of living at 4019 West Van Buren.  The Bostic Organization used Moore's apartment in 4019 West Van Buren as a meeting location, a place to store narcotics and guns, and a place to hang out together.  On a frequent basis, members of the Bostic Organization also returned drug proceeds to Richards at 4019 West Van Buren.

## III.    Guns Were Possessed and Used in Furtherance of the Conspiracy

Without having to sell a single blow of heroin, pass out packs of heroin to street supervisors, collect heroin proceeds, or carry a gun, Bostic controlled the Bostic Territory and the sale of heroin in that Territory.  As detailed below, this was because members of his organization, including Moore, protected the gang and its territory with guns, violence, and threats of violence.  Because dangerous weapons were possessed by coconspirators during and in furtherance of the conspiracy, the § 2D1.1(b)(1) enhancement for possession of a dangerous weapon is appropriate and should be applied to Moore's base offense level.

### A.    Title III Interceptions

During the course of the investigation of the Bostic Organization, numerous calls were intercepted among the coconspirators, in which the coconspirators discussed the Bostic

Organization's guns or sought Bostic's permission to use the Bostic Organization's guns. These interceptions demonstrate that Moore and his coconspirators possessed guns during the conspiracy and in furtherance of the conspiracy and that it was reasonably foreseeable to Moore that his coconspirators would possess and use guns in furtherance of the conspiracy.

### 1. Interceptions and Seizure of Gun in Connection with the Arrest of Bagley

As set forth in the Affidavit and PSR, on May 4, 2010, Chicago Police Department officers arrested coconspirator Aaron Bagley after observing him passing out heroin to street workers and customers in the Bostic Territory. PSR at lines 110-115. That morning at approximately 10:34 a.m., following Bagley's arrest, Bostic was intercepted in a conversation with Richards discussing Bagley's and Individual B's arrests.[2] During the conversation, Richards told Bostic that the police wanted a gun in exchange for the release of Individual B. Richards also told Bostic that he was going to get all of the Bostic Organization's guns later. *Id.*

As set forth in the Affidavit and PSR, when Bagley offered to give the CPD officers a gun in exchange for the release of Individual B, he told the officers he could get the gun "from the block," meaning the Bostic Territory. *Id.* Coconspirator Raynard Bowser obtained a gun, which he left for the officers in bag located at on the 4100 block of West Congress. CPD officers recovered one brown bag, which contained a chrome Lorcin model L380 handgun.

### 2. Interceptions Regarding Gun Purchases by Members of the Bostic Organization

Calls were also intercepted in which members of the Bostic Organization informed Bostic of guns that were available for sale or which had been purchased. As set forth below, the

---

[2]*See* Affidavit [Dkt. 1], ¶¶ 136-149.

interceptions also demonstrate that Moore was aware or should have been aware of the guns purchased and used by the Bostic Organization.

For example, on February 13, 2010 at approximately 2:31 p.m., an outgoing call from Target Phone 1, used by Richards, to push-to-talk number XXX*XXX*3322, used by Gun Supplier A was intercepted. During the call, Gun Supplier A said to Richards, "I got a nice thirteen [shot] nemo demo [gun] over here on Jackson for [sale for] two fifty [$250]." Richards responded, "You say what now?" Gun Supplier A said, "I said got a nice chrome lil' thirteen [shot], thirteen hit demo [gun] for two fifty [$250] right now." Richards said, "Oh, okay. Get up with Lil' One [Bagley]. Get up with Lil' One [Bagley], man. Right now!" Gun Supplier A said, "Call Lil' One [Bagley], G. Tell him to come right . . .Call Lil'. Tell him to slide on the other side, uhh. . ., Pulaski, the cuzzo crib [meet on the other side of Pulaski at the cousin's residence]. Or you gonna need Rock [Hunter] take this mother fucker [gun] to him?" Richards said, "Today, today. But get up with . . . I finna hit [going to call] Lil' One [Bagley] to get up with you [to meet you]."

Additionally, on April 23, 2010 at approximately 11:03 a.m., Richards informed Bostic that Gill told him that a supplier was selling revolver for $200 and that he, Richards, had directed Gill to get the gun. Specifically, Richards said, "Yep, Beano [Gill] said motherfucker, um, sell a fo' [four inch] nickel for a deuce [$200], but it's a revolver. So I told him to go get that motherfucker." Bostic asked, "Where it's at? Oh." Richards said, "Yeah, I told him to get it, shit." Bostic said, "Um, yeah." Richards said, "I don't give a fuck what it is." Bostic repeated, "Give a fuck what it is."

### 3. Interceptions Regarding Use of Guns to Protect Territory

As detailed in the Affidavit in paragraphs 290-294, on May 5, 2010 at approximately 4:49

p.m., an unknown female called Richards, warning him to tell coconspirators Maurice Davis and Moore to watch out for certain individuals in two vehicles who had arrived in the Bostic Territory. Later that evening, at approximately 5:56 p.m., Davis called Richards, asking for a gun. Richards then called "D-Mack," asking him to get a gun and bring it to Davis.

In response to those calls, CPD officers conducted stopped and searched the individuals in the vehicles described in the first call, seizing a Kel-Tec, model P, serial #AED17, .9 mm semi-automatic pistol with a magazine and seven live rounds. While no guns were seized from members of the Bostic Organization that day, the above calls demonstrate that the Bostic Organization's guns were located nearby and accessible to members in order to protect the Bostic Territory.

### B.    Coconspirator Statements

Cooperating defendants Aaron Bagley, Cornelius Thomas, and Maurice Davis each admitted in his plea agreement [Dkt. #484, 485, 537] that members of the Bostic Organization, including Davis, used guns, violence, and threats of violence to protect the drug spots and territory controlled by the Bostic Organization.

For example, Bagley stated in his plea agreement that he had learned through other members of the Bostic Organization about specific acts of violence that were committed by the members of the Bostic Organization, including direct admissions from the individuals who committed certain acts of violence and shootings. He also knew that if a member of the Bostic Organization needed a firearm, they contacted Gill or Richards to obtain the firearm.

Cornelius Thomas admitted that members of the Bostic Organization kept firearms on West Van Buren Street and elsewhere in order to protect the Bostic Organization's narcotics and cash

drug proceeds. He acknowledged that he saw Gill and others with a firearm at 4019 West Van Buren Street, where Thomas turned over drug proceeds to the Bostic Organization. Thomas also knew that he could place phone calls to New Breeds such as Davis if he needed to obtain a firearm. He also admitted to renting cars that were used in the commission of acts of violence, including the shooting of members of rival gangs.

In addition to admitting to his own possession and use of guns and the possession and use of guns by other members of the Bostic Organization, Davis admitted that, on February 17, 2010, he observed Cornelius Thomas, aka "Mike" and "Bunny," distributing narcotics in the territory controlled by the Bostic Organization. At that time, the Bostic Organization had depleted its supply of heroin for street-level distribution, and, as a result, members of the Bostic Organization should not have been able to engage in street sales of narcotics. Davis called Richards, admitting to Richards that he, Davis, "just smacked the shit out of Bunny," referring to Cornelius Thomas. Davis asked Richards, "You know this motherfucker servin'," referring to selling narcotics. Davis then told Richards that he watched Cornelius Thomas sell narcotics to a customer, and Richards wondered where Cornelius Thomas had obtained the narcotics. In a later conversation, DAVIS told Richards that Cornelius Thomas had just taken the beating without putting up a fight, saying, "That nigga took that smacking and went on in."

In his post-arrest statement, Ladonta Gill, who is not cooperating with the government, admitted that he had seen Tommy Moore with a gun several times at 4019 West Van Buren and knew that guns were stored there. He provided information about murders committed by members of the Bostic Organization and violence connected to the Bostic Organization to protect the lucrative drug territory. Gill identified Individual A as having shot a member of the Four Corner Hustlers

over drug territory in the summer of 2008. Gill also identified Individual A, Individual B, and Individual C (unindicted coconspirators) as being "shooters" for the New Breeds and admitted to having seen these individuals, as well as Bostic, with guns.

### C.    Seizures of Guns

As discussed in the Government's Version, in addition to the seizure of the gun in connection with the arrest of Aaron Bagley, law enforcement recovered a Browning .22 caliber handgun with a defaced serial number and a Hi-Point .40 caliber handgun from a crawl space adjacent to coconspirator Richards's bedroom at the time of his arrest in this case. Also, law enforcement recovered guns from 4019 West Van Buren prior to the initiation of the investigation in this case but while the conspiracy was on-going.

### D.    Shootings

As discussed in the Government's Version of the Offense, Moore has been the victim of two shootings and identified as being involved in other shootings.

### E.    Moore's Role

Moore was involved in the Bostic Organization for a number of years. Considering his role as a street supervisor, that he was identified as someone who should protect the Bostic Territory in the call on May 5th, that members of the Bostic Organization used his residence at 4019 West Van Buren to store drugs and guns, and the Bostic Organization's possession and use of firearms was well-known within the group, Moore knew or should have known that guns were kept in furtherance of the Bostic drug conspiracy.

Additionally, Moore was a shooter for the Bostic Organization. As detailed in the Government's Version of the Offense, Moore and co-defendant Ladonta Gill were involved in an

aggravated battery on August 23, 2008. Although Gill was apprehended and charged with a weapon's violation, Moore got away.

## IV. Moore's PSR

### A. Moore's Offense Level

For his involvement in the conspiracy, the U.S. Probation Officer calculated Moore's base offense level to be 36, because the amount of heroin attributable to Moore was at least 10 but less than 30 kilograms. PSR at lines 168-209.

After reducing the offense level by three for acceptance of responsibility, Moore's total offense level is 33. PSR at lines 258-265. Combining the total offense level of 33 with a criminal history category III, the U.S. Probation Officer concluded that Moore's advisory guideline range is 168 to 210 months' imprisonment. PSR at lines 520-524.[3]

As set forth below, it is the government's position that because Moore qualifies for the two-level enhancement for possession of a dangerous weapon, his offense level is 38. After reducing the total offense level for acceptance of responsibility, his total offense level is 35. It is also the government's position that Moore is a criminal history category IV, resulting in an advisory guideline range of 235 to 293 months' imprisonment. Moore is subject to a minimum term of imprisonment of 10 years. PSR at lines 560-561.

### B. Gun Enhancement

In calculating Moore's offense level, the U.S. Probation Officer declined to apply the two-level enhancement for possession of a dangerous weapon, pursuant to § 2D1.1(b)(1). PSR at lines

---

[3]In line 562, the Probation Officer incorrectly states that the total offense level is 35 and, accordingly, states that the guideline range is 210 to 262 months' imprisonment.

210-239. Referencing the evidence summarized in the attached Government's Version of the Offense, the PSR states that "the government has sufficiently proven that certain members of the New Breeds street gang possessed and used firearms, generally speaking." PSR at lines 222-223. The PSR continues: "However, as of the date of this report, there has been no evidence showing a connection between the possession/use of firearms and the drug trafficking organization." PSR at lines 224-225. In declining to impose the enhancement, the PSR states,

> Undoubtedly, certain members of the New Breeds street gang possessed, and used, firearms on some occasions, and Defendant Moore may or may not have been aware of the same; however, absent any connection between the drug distribution business and the possession of firearms by members/associates of the gang in general, the undersigned does not believe that there is sufficient evidence to conclude that Defendant Moore is responsible for the possession of a firearm as it relates to the conduct charged in Count One of this indictment.

PSR at lines 233-239. The PSR is incorrect.

### C.     Criminal History

The Probation Officer calculated Moore criminal history points to be five, yielding a criminal history category of III. PSR at lines 331-332. The Probation Officer did not include two additional criminal history points under § 4A1.1(d) because although Moore was under a criminal justice sentence in Case No. 09128710901, the Probation Officer did not find his conviction for gambling countable for criminal history points under § 4A1.1.

As set forth above, at the time Moore was a member of the conspiracy, he was also on parole for his 2006 conviction for possession of a controlled substance. *See* PSR at lines 297-304. His coconspirators identified him as a runner for the Bostic Organization as early as 2007 and no later than Spring of 2008. According to Moore's PSR, he was not discharged from parole until August 14, 2008. Accordingly, his criminal history points should include two additional points under § 4A1.1(d).

## V.    ANALYSIS

Pursuant to § 2D1.1(b)(1), the offense level is increased by two levels "[i]f a dangerous weapon (including a firearm) was possessed."  As Application Note 3 makes clear, "the adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  In making this determination, a sentencing court may "rely on information that has sufficient indicia of reliability to support its probable accuracy." *United States v. Turner*, 604 F.3d 381, 385 (7th Cir. 2010) (internal quotations and citations omitted).  "Further, the Federal Rules of Evidence do not apply at sentencing, meaning that the court may consider hearsay evidence and other information not admissible at trial." *United States v. Galbraith*, 200 F.3d 1006, 1011-12 (7th Cir. 2000) (citation omitted).

For the § 2D1.1(b)(1) enhancement to apply, the government must prove by a preponderance of the evidence that a gun was possessed during the commission of the offense or relevant conduct. *United States v. Berthiaume*, 233 F.3d 1000, 1003-04 (7th Cir. 2000).  If the government satisfies this standard, the burden shifts to the defendant to show that it was clearly improbable that the gun was connected to the offense.  *Id.* at 1004.  A defendant qualifies for this enhancement "if coconspirators possessed firearms in furtherance of the conspiracy and [the defendant] could have reasonably foreseen the coconspirators' possession." *United States v. White*, 582 F.3d 787, 796 (7th Cir. 2009) (internal quotations and citation omitted).  *See also United States v. Tanner*, 628 F.3d 890, 908 (7th Cir. 2010) (evidence that defendant's coconspirators possessed firearms during the drug conspiracy was sufficient to support the firearm enhancement); *United States v. Martin*, 618 F.3d 705, 737-38 (7th Cir. 2010) (constructive possession or a coconspirator's foreseeable possession may be sufficient for application of the enhancement.).  The government has met its

burden of proving by a preponderance of the evidence that guns were possessed during the commission of the heroin conspiracy and that it was reasonably foreseeable to Moore that his coconspirators possessed firearms in furtherance of the conspiracy.

First, law enforcement seized a gun that was directly connected to the conspiracy while the conspiracy was on-going. As discussed above, after his arrest for distributing the Bostic Organization's heroin in the Bostic Territory, Bagley arranged for Bowser to provide a gun to law enforcement in order to have his cousin, who was arrested while in the possession of the Bostic Organization's heroin, released from custody. This possession of a gun by Bowser for Bagley to secure the release of Bagley's cousin was in furtherance of the drug conspiracy.

The Seventh Circuit confronted a similar situation in *United States v. Gonzalez*, 608 F.3d 1001 (7th Cir. 2010). There, the Seventh Circuit held that the § 2D1.1(b)(1) enhancement applied to a defendant convicted in a drug conspiracy who was arrested while driving with his girl friend, and the police found crack cocaine in her possession. 608 F.3d 1006. Like Bagley, the defendant made a deal to give guns to law enforcement to secure the release of his girlfriend from custody. *Id.* Again, like Bagley, the defendant obtained guns from his fellow drug gang members and supplied them to law enforcement. *Id.* In finding that the § 2D1.1(b)(1) enhancement applied, the Seventh Circuit explained, "So the guns were possessed by him in connection with the conspiracy (as in *United States v. Acosta*, 534 F.3d 574, 588 (7th Cir. 2008)), the connection being established by the fact that he used them to obtain at least temporary freedom for a coconspirator." *Id.* Because it was reasonably foreseeable to Moore that guns were possessed by coconspirators, including Bagley, the § 2D1.1(b)(1) enhancement applies to him as well.

Second, law enforcement seized guns from coconspirator Richards on August 11, 2010, the

same day that Moore was arrested in this case. As established in the calls and statements set forth above, Richards was responsible for maintaining and storing guns for the Bostic Organization. He also provided access to guns to other members of the Bostic Organization when needed for protection of the Bostic Territory. Moore's position in the Bostic Organization would and/or should have given him the knowledge that Richards possessed guns for the Bostic Organization, making the § 2D1.1(b)(1) enhancement appropriate.

Third, contrary to the suggestion in the PSR, it is not necessary for the government to establish the presence of drugs at the same place where a firearm is found to support the dangerous-weapon enhancement. *See White*, 582 F.3d at 796. *See also United States v. Mitten*, 592 F.3d 767, 777 (7th Cir. 2010) (evidence sufficient to support verdict on 924(c) violation: "There is no requirement that a drug dealer have a gun in his possession during uncharged sales in order for his possession of a firearm to be in furtherance of the crime of possession of crack with intent to distribute.") In this case, law enforcement recovered guns from members of the conspiracy, including Richards. As in *White*, cooperating defendants Bagley, Cornelius Thomas, and Davis have admitted that members of the Bostic Organization used and carried guns to protect the drug spots and territory controlled by the Bostic Organization.[4] Defendant Raynard Bowser also admitted that

---

[4]Each of the cooperating defendants, namely, Bagley, Cornelius Thomas, and Davis, pleaded guilty to cooperation agreements with the government. In their plea agreements, these cooperating defendants agreed that the two-level enhancement for possession of a dangerous weapon applied to their offense levels. Defendant Raynard Bowser, who is not cooperating with the government, also admitted that dangerous weapons were possessed and agreed that the two-level enhancement for possession of a dangerous weapon applied to his offense level. To date, the government has received the PSR for Cornelius Thomas and Bowser only. The government notes, however, that the Probation Officer applied the § 2D1.1(b)(1) enhancement to their offense levels. Each of these coconspirators was at the same level in the Bostic Organization as Moore – all were street supervisors, which makes it that much more likely that Moore had the same knowledge of the guns used by the Bostic Organization as his peers. Additionally, coconspirator Brandon Richards

the two-level enhancement for possession of a dangerous weapon applied. [Dkt. #506 at 7.] He admitted that members of the Bostic Organization kept firearms on West Van Buren Street and elsewhere in order to protect the Bostic Organization's narcotics and cash drug proceeds, and in furtherance of the Bostic Organization's drug trafficking activities. *Id.* at 5. Specifically, Bowser admitted that he talked with Richards and others about firearms that Richards had arranged to obtain for the Bostic Organization. *Id.* Moreover, Moore was an individual identified in an intercepted call as being someone who should be called to protect the Bostic Territory. This is sufficient for the § 2D1.1(b)(1) enhancement to apply.[5]

Fourth, there is no reason to draw an artificial distinction between the Bostic Organization's gang activity and its heroin trafficking. The Bostic Organization's heroin trafficking yielded the proceeds that were used to purchase guns for the Bostic Organization and to provide financial support to its members. Its other gang activity, including various shootings, homicides, violence, and threats of violence, furthered its heroin trafficking, as the Bostic Organization and Bostic maintained control of heroin sales in an entire area on the west side of Chicago. Unlike drug spots controlled by different gangs in the Chicago area, it was not necessary for the Bostic Organization

received the two-level enhancement for possession of a dangerous weapon in his PSR.

[5]The Probation Officer also states, "Although it is clear that violence and firearms were a regular course of the gang's business, and it is likely that where there are narcotics sales, there are weapons to protect the drugs, Agent Lacy [*sic*] could not provide the probation office with direct evidence linking firearms to narcotics at 4019 West Van Buren or any other location used by the Bostic Organization for drug trafficking." In short, because no gun was recovered next to drugs, the Probation Officer incorrectly concludes that the enhancement does not apply. The Probation Officer has ignored the direct evidence of the coconspirator statements and admissions, including in their plea agreements, the recovery of the gun from Brandon Richards' residence, and the numerous interceptions in which guns are discussed. Moreover, the Probation Officer has failed to follow the Guidelines – the adjustment "*should be applied* if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."

to have a member designated to stand on a corner with a gun to protect the heroin sold in a single spot. As demonstrated in some of the intercepted calls discussed above, the Bostic Organization had its guns stored nearby and individuals ready to provide them at a moment's notice to protect the entire territory. And even the lowest members of the heroin conspiracy, including street-level dealers like Tommy Adams, knew that they worked in "Bird's" territory – "Bird" being Bostic.[6] In short, the Bostic Organization and its members, including Moore, possessed guns during and in furtherance of the conspiracy. The § 2D1.1(b)(1) enhancement should therefore be applied to Moore's offense level.

## VI.    CONCLUSION

For the reasons set forth above, the government respectfully objects to the Presentence Investigation Report and requests that the Court apply the two-level enhancement for possession of a dangerous weapon, pursuant to § 2D1.1(b), and find that Moore's criminal history category is IV.


Dated: April 16, 2012                                Respectfully Submitted,

                                                     PATRICK J. FITZGERALD
                                                     United States Attorney

                                         By:    /s/ Megan Cunniff Church
                                                MEGAN CUNNIFF CHURCH
                                                BETHANY K. BIESENTHAL
                                                YASMIN N. BEST
                                                Assistant United States Attorneys
                                                219 South Dearborn, 5th Floor
                                                Chicago, Illinois 60604
                                                (312) 886-1173

---

[6] A copy of the CPD report of the post-arrest statement of Tommy Adams is included in the Court's record for this case at docket #307-1.