**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **No. 10 CR 673-14** |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Judge Matthew F. Kennelly** |
| | ) | |
| **TOMMY MOORE** | ) | |
| | ) | |
| **Defendant** | ) | |

**MOORE SUPPLEMENTAL SENTENCING MEMORANDUM**

In its Supplement To Objections To PSR filed on August 3, 2012 (R. 737), the government states that the "line sheets of intercepted calls over the Title III wiretaps on the phones of Brandon Richards and Dana Bostic" show that Tommy Moore was involved in the daily drug operation, citing pages 27 and 28 of Exhibit A, the so-called "line sheets" for T III wiretaps. R. 737, p. 1. Even a cursory reading of the cited conversations do not illustrate that Moore was a daily participant in Bostic's drug operation. In fact they suggest the opposite. The calls cited by the government occurred on March 5 and 6, 2010. The government had Title III orders relating to seven (7) different telephones over a six month period. It is hardly fair to interpolate years of conduct from a couple of phone interceptions in early March, 2010, especially when the government intercepted thousands of calls.

In the second paragraph of its Supplement to its PSR objections (R. 737), the government states that the "attached arrest reports of Moore" show that CPD "recovered two guns from defendant's residence." R. 737, p. 1. According to the attached police

1

report Tommy Moore went to his apartment on the 2nd floor when police "knocked on the door and the guns were located after a "systematic search of the first floor apartment." EX B, p. 2 attached to R. 737. In other words the guns were not located in Moore's apartment, but in someone else's apartment. In addition, the charges were dismissed on May 5, 2009. See PSR, p. 21, line 401.

The government's most recent filing regarding Tommy Moore, R. 748, states the Tommy Moore's arrest February 27, 2006, and subsequent plea of guilty on May 15, 2006 to a violation of probation (see PSR, p. 16), was part and parcel of this heroin conspiracy. "Accordingly, Moore's … criminal history category is II. When combined with a total offense level of 35, the resulting advisory guidelines range is 188 – 235." R. 748, p. 2, f. 1. Defendant agrees with this calculation.

In a footnote on page three of this filing, R. 737, the government states that because counsel has challenged the government's estimated drug quantity it "will argue that Moore is not entitled to acceptance of responsibility." In doing so, the government acknowledges the difference between factual admissions by the defendant and legal arguments by counsel. Defendant has pleaded guilty to the charge set forth in the indictment and has not disputed any facts regarding his conduct. Counsel's argument/disagreement with the government's calculation of the drug quantity should not impact acceptance of responsibility.

As to the issue of drug quantity, a better estimation of Tommy Moore's involvement would be to look at the overheard phone calls and surveillance, and most importantly, his financial stake. Moore's minimal involvement is reflected in the few times he is overheard on the tapes and mentioned in the Complaint, R. 1. Out of 554

paragraphs describing the conspiracy, Moore is mentioned in only 14 paragraphs. See R.,

paras. 55, 69-70, 111, 146, 159-160, 162, 164-168, 171 and 290. Among the thousands

of phone calls overheard and identified as important by the government, Tommy Moore

is only overheard once. R., para. 111. In one phone call, paragraph 146 of the

Complaint, Bostic and Richards are talking about Bagley being arrested and they identify

Tommy as an informant, "Tommy was talking to the police and all types of shit. …

Tommy gunna get hurt." R. 1, p. 57. Following the Complaint, in all the months of this

investigation Moore was identified only once by law enforcement during its surveillance,

paragraphs 164-168 of the Complaint. This is not to say he is or was innocent, but it is

more than a stretch to say that "Tommy Moore was involved in the daily drug operation

of the Bostic operation." Government's Supplement To Objections To Presentence

Investigation Report, R. 737, p. 1. His low level involvement is reflected by the $20.00

a day he earned when he was involved.

The government places great reliance on the testimony of Davis, Bagley and

Thomas. The Court has heard these three individuals testify on two different occasions,

July 2 and 5, 2012 and August 2, 2012. Counsel has copies of the transcripts of both

hearings and therefore defendant will not insist on the government calling them to testify

a third time. However, since the government relies on them in attempting to tie

defendant to the murder of D-Low, Davon Taylor, on August 21, 2008 and another

shooting on August 23, 2007 (R. 748, p. 4-13), defendant will address their testimony.

Tommy Moore denies being involved in either event and submits that the

government's evidence tying him to them is very suspect. As noted in defendant's

Objections To PSR And Sentencing Memorandum (R. 711), Maurice Davis is a

pedophile and a liar, unworthy of belief. He has four convictions and he lied to law enforcement authorities about his rape of a cellmate at the MCC after he began cooperating with the government. R. 711, p. 11. He has every reason to lie regarding Tommy Moore since in his, Davis', mind the more helpful he is to the government the more likely it is that he would/might receive the "lighter sentence" he hopes for. Tr. August 2, 2012, p. 40.

Bagley also agreed to testify in order to "reduce my sentence." Tr. August 2, 2012, p. 163. It should be noted that Bagley began his involvement with the Bostic operation in 2001. In Bagley's 20 pages of testimony at Bostic's sentencing hearing, he mentions Tommy Moore twice. On page 170 he was asked who "hung out" around 4019 W. Van Buren. He answered "me, Tommy Moore and some more people who they're not in the conspiracy and got nothing to do with the case." Tr. August 2, 2012, p. 170. On page 177, he is asked "were there certain people in your organization who were known to be shooters for the group." He answered Gill, Tommy Moore and Charles Cowart and "various other people." He gave no particulars and did not express any personal knowledge. More to the point, the prosecutor asked no more questions. Tr. August 2, 2012, p. 177. Not only do we not know the source of Bagley's information, we do not know the basis of his sources' knowledge.

Cornelius Thomas testified that he saw Gill and Tommy Moore do a shooting on Madison Street. This shooting occurred on August 23, 2012. R. 748, p. 11. Thomas also has multiple convictions and was testifying in order to get a lower sentence. Tr. August 2, 2012, p. 198-199. Thomas's testimony is also very suspect. He agreed to cooperate and to tell the truth pursuant to a 'proffer letter' yet he lied in that proffer. He knew all he

4

had to do was tell the truth and he could not/did not do so. According to him he "lied about a lot of stuff" in that October 25, 2010 proffer. Tr. July 5, 2012, p. 150. "I didn't feel comfortable with talking to the government." Tr. July 5, 2012, p. 149. Whatever his explanation for lying, the fact is that he lied. He lied after being told of the importance of telling the truth, probably by his own lawyer and the prosecutor. And remember his motivation in talking to the government was to get a lower sentence. He gave another proffer on June 20, 2011, 8 months later, and he "still didn't tell the whole truth." Tr. July 2, 2012, p. 153. This proffer was made because "I was trying to help myself out because I don't want to do a long sentence in prison." Tr. July 2, 2012, p. 154. His motivation in these two proffers was to get a lower sentence and we know that in pursuit of that lower sentence he lied in his first proffer and did not tell the whole truth in his second proffer. In other words, to get a lower sentence he was prepared to and did in fact lie. His state of mind is illustrated by the following question and answer.

Q. You were trying to make them think you were telling the truth when you weren't telling the truth, isn't that true?

A. Correct. Tr. July 5, 2012, p. 154.

Defendant would again point the Court to the warning given by Judge Stephen Trott that "criminals are likely to say almost anything to get what they want, especially when what they want is to get out of trouble with the law." Hastings L. J. 1381, 1382.

The government argues that these witnesses identified Moore not having had access to law enforcement reports. Irrespective of actually having the police reports, of course at some point their lawyers did, they undoubtedly knew and discussed the police reaction to the murder and the shooting, including the questioning of numerous people in

the neighborhood and especially the police's midnight foray to "locate and interview Moore" at 4019 W. Van Buren on August 26th, three days after the shooting. Moore was a bright line target for their ambition. He had been arrested and questioned regarding the murder and was their codefendant in this case. There may not have been a water cooler to gather around to discuss hot topics, but there surely were discussions and gossip and rumors.

The government also states that "Moore does not explain his presence at the gas station during the homicide." R. 748, p. 13. According to the government, Tommy Moore was in a car at the gas station located at 5150 West Chicago Avenue when D-Low was murdered. The only witness who placed Moore at the gas station at the time of the shooting was Maurice Davis. The Court will note the first paragraph on page 9 of Government's Response To Defendant's Objections To PSR And Sentencing Memorandum. R. 748, which summarizes the government's evidence that Moore was at the scene, "according to Davis," "as Davis testified," "as Davis testified," "according to Davis," "Davis explained" and "Davis later." Davis is lying.

The lynch pin regarding Tommy Moore at the scene was his supposed presence in a Chevy Impala which was evidently in the gas station at time of the murder. The police reports reflect that police traced the Impala to a Nigel Odum. See GX C, p. 6 attached to R. 748. Odum initially denied he or his car were there, stating that he was at work at the time of D-Low's murder and that "he was the only one who uses that car." R. 748, GX C, page 7. Odum then told police that he was in the car with Marktwain Johnson and Tommy Moore and that Tommy Moore was driving. Odum stated they were just buying gas and did not see or know of the shooting. Odum, who has not testified, is of

questionable credibility, given that he at first lied.  Then he subtly shifted responsibility for being there to Moore, by naming Moore as the driver.

The police then interviewed Marktwain Johnson .  When asked if "he was at the gas station," Johnson said he was not.  When told that Odum had placed him at the scene, "Johnson denied being with Odum that night."  Who is the Court to believe, Odum or Johnson?  He also denied knowing Tommy Moore although the police noted to him that they lived at the same address.   R. 748, EX C, p. 8.  It is not without significance that the police were aware of Moore's address.  Nonetheless "Johnson again stated he didn't know Moore."  GX C, pa. 7.  Of course, the government has the burden of proof.

Now comes the interesting part.  "At 0010 hours on 16 (sic) August2008 R/d Detectives [Detectives Burke and Suvada] went to 4019 Van Buren in nas attempt to locate and interview Tommy Moore."  R. 748, GX C, p. 8.  According to the police report, Tommy Moore voluntarily "agreed to come to Area 5 and be interviewed."  Common sense suggests that police went to the Van Buren address in force, this was a murder investigation and it was the middle of the night and arrested Moore, taking him in handcuffs to the station, for questioning.   According to the report, Moore "denied being on the scene of the shooting" and "denied being with Odum and Johnson in Odum's car. R. 748, GX C, p. 8.  The report then states that Moore "agreed to stay overnight at area 5."  R. 748, GX C, p. 8.   After he supposedly agreed "to stay overnight at area 5", he was questioned again the next day by two other detectives, Gonzalez and Cardo.  R. 748, GX C, p. 8. "Moore was "allowed to leave area 5" after he admitted being at the gas station. It should be noted that Moore again "denied any involvement in the shooting."  R. 748,

GX C, p. 8.  The Court should note that the sole source for what went on at the station

and who said what is based on police reports only.

Defendant would submit that he was in custody at the time the above statements

were supposedly made.  A reasonable person would not have felt he was free to leave and

reasonable people do not choose to sleep in a jail cell instead of their own bed at home.  It

is telling that although the police report states that Moore "agreed to come to Area 5 to be

interviewed" and agreed to stay overnight, the officers never told him he was free to

leave.  The reason they did not was that he was not free to leave; he was under arrest.   As

noted in J. D. B. v. United States,     U.S.    , 131 S. Ct. 2394 (June 16, 2011), a court

must examine how a reasonable person in the suspect's position "would perceive his or

her freedom to leave," citing Stansbury v. California, 511 U. S. 318, 322 (1994).   Both

interrogations were a violation of his right against self-incrimination.


 "The exclusionary rule serves as a remedy for various constitutional violations, but on
differing rationales.  When the Fifth Amendment is implicated, as in the case of a coerced
or otherwise dubious confession, suppression is invoked primarily on the theory that the
evidence is tainted by unreliability and a conviction obtained by its use might be
suspect."  United States v. Torres, 926 Fd2 321, 322-323 (3rd Cir. 1991)

In a recent Seventh Circuit case, the court stated that the admonitions in Miranda

were designed to safeguard against self-incrimination.  United States v. Ambrose, 668

F3d 943, 954 (7th Cir. 2012)

"The Miranda Court recognized that the inherently coercive nature of custodial
interrogation could blur the line between voluntary and involuntary statements, and that
the prophylactic measures were necessary to protect the constitutional right.  (citation
omitted)  Accordingly, Miranda held that the government may not use statements
stemming from the custodial interrogation of a defendant unless the government has
utilized procedural safeguards effective to secure the privilege against self-
incrimination."    Id. At 954.

Given the above, defendant suggests that any reliance by the government on Moore's custodial interrogation suffers from two infirmities. It was unconstitutionally obtained and therefore may not be used against him. Although many courts have allowed a broad range information to be used at sentencing, including otherwise inadmissible evidence, it did so because that evidence was reliable. The constable may have stumbled, but the evidence was probative and reliable. For instance, several courts have allowed evidence obtained in violation of the Fourth Amendment to be used at sentencing. United States v. Brimah, 214 F3d 854, 857-859 (7th Cir. 2000); United v. Acosta, 303 F3d 78, (1st Cir. 2002); United States v. Ryan, 236 F3d 1268, 1271-1272 ((10th Cir. 2001). But Fourth Amendment violations do not impact the reliability of the evidence. The circumstances of Moore's agreement to come to Area 5 and then stay overnight and lack of any first hand knowledge as what occurred and was said at the station make the government's reliance on this 'information' very suspect.

This shooting occurred over four years ago. If Moore is to be punished for any role he might have played in it, then he should be charged and given the right to defend against that charge. Attempting to use it in this proceeding to enhance his punishment is contrary to the spirit and the letter of the Fifth Amendment to the Constitution. As noted in Torres above, such statements are suppressed "primarily on the theory that the evidence is tainted by unreliability." Torres at 322-323.

Defendant faces a minimum sentence of 10 years. The government argues that the guidelines point to an offense level of 35 and a criminal history category of II which translates into a guideline sentence of 188- 235 months. Defendant argues that Moore merits a three (3) point decrease for acceptance of responsibility and therefore an offense

level of 32 which translates into a guideline sentence of 135-168. However, defendant

submits that a sentence below this guideline range is appropriate in this case.

As the Court is well aware, the Guidelines are just one of the factors to be

considered in fashioning an appropriate sentence. *United States v. Sachsenmaier*,

491 F.3d 680, 685 (7th Cir. 2007). The objective is to "impose a sentence sufficient, but

not greater than necessary" to accomplish the sentencing goals of §3553(a). This case

represents a situation in which the Court should consider a sentence below the guidelines

given the nature and circumstances of the offense, the defendant's plea of guilty and his

background.

> "It has been uniform and constant in the federal judicial tradition
> for the sentencing judge to consider every convicted person as an
> individual and every case as a unique study in the human failings that
> sometimes mitigate . . . the crime and the punishment to ensue."

*U.S. v. Gall, 552 U.S.38, 49 (2007).*

Respectfully submitted,

    **s/  Michael B. Nash**
    **Michael B. Nash**

**Michael B. Nash**
53 West Jackson Boulevard
Suite 615
Chicago, Illinois  60604
(312) 236-8788
*Attorney for Defendant*
*Tommy Moore*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing MOORE SUPPLEMENTAL SENTENCING MEMORANDUM was served in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

s/    Michael B. Nash
**MICHAEL B. NASH**
53 West Jackson Boulevard, Suite 615
Chicago, Illinois 60604
(312) 236-8788
